UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

U.S. Dep't of Labor, Secretary of Labor

   v.

Unitil Service Corp.

Civil No. 19-cv-693-LM
Opinion No. 2021 DNH 177 P

**O R D E R**

The United States Secretary of Labor ("DOL") brings this Fair Labor Standards Act ("FLSA") suit against Unitil Service Corporation.  DOL alleges that Unitil Service violated FLSA's overtime compensation and recordkeeping requirements with respect to persons Unitil Service employed as Electric Distribution Dispatchers ("Dispatchers") and Senior Gas Controllers ("Controllers").

Before the court are DOL's and Unitil Service's cross-motions for summary judgment (doc. nos. 19, 20, and 21).  The parties do not dispute that Dispatchers and Controllers have worked overtime hours but were not paid overtime wages for that work, nor that Unitil Service failed to create and maintain records of the hours those employees worked.  Rather, Unitil Service contends that Dispatchers and Controllers are exempt from FLSA's requirements because they are administrative employees.  In contrast, DOL argues that the employees are not administrative employees because their primary duties are not directly related to Unitil Service's general business operations.  DOL also argues that genuine disputes of material fact exist as to whether the employees exercise discretion and independent

judgment as part of their primary duties.  The parties also dispute the admissibility of the declaration of DOL Investigator Divya Sood.

For the reasons set forth below, the court grants Unitil Service's motion for summary judgment (doc. no. 21) and denies DOL's motion for summary judgment (doc. nos. 19, 20).

## LEGAL STANDARD

A moving party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Joseph v. Lincare, Inc., 989 F.3d 147, 157 (1st Cir. 2021).  The court construes all facts and reasonable inferences in the light most favorable to the nonmoving party.  Thompson v. Gold Medal Bakery, Inc., 989 F.3d 135, 141 (1st Cir. 2021).  The court treats cross-motions for summary judgment separately, drawing inferences in the nonmoving party's favor.  AJC Intern., Inc. v. Triple-S Propiedad, 790 F.3d 1, 3 (1st Cir. 2015).  To generate a genuine dispute, evidence must be "more than merely colorable" and it must be "significantly probative" of the pertinent fact, meaning that a reasonable jury might be able to find in the nonmovant's favor.  See Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

## BACKGROUND

Unitil Service is a wholly-owned subsidiary of Unitil Corporation.  Unitil Corporation, through several subsidiary corporations, purchases electricity and

natural gas and distributes it to residential, commercial, and industrial users in New Hampshire, Massachusetts, and Maine.  Unitil Corporation and its subsidiaries own and maintain physical infrastructure, such as electrical wires, switches, and substations and natural gas pipelines.  Unitil Corporation and its subsidiaries neither own power plants nor generate any electricity or produce any natural gas themselves.

The Unitil Corporation umbrella includes a collection of wholly-owned subsidiaries that play distinct roles in the distribution of electricity and natural gas. Unitil Service's role under the Unitil Corporation umbrella is to provide "a variety of administrative and professional services on a centralized basis to affiliated Unitil companies, including regulatory, financial, accounting, human resources, engineering, operations, technology, energy management and management services."  Doc. no. 20-6 at 7.  Pertinent to this FLSA suit, Unitil Service employs workers who operate centralized control rooms for its customers.  Unitil Service's customers are other subsidiaries of Unitil Corporation that own the physical infrastructure.

DOL asserts that Unitil Service has violated FLSA as to two categories of employees who work in its centralized control rooms: Dispatchers and Controllers. Unitil Service does not pay Dispatchers or Controllers a standard overtime rate (one- and one-half times their hourly wage) when they work more than 40 hours in a workweek.  Rather, Unitil Service classifies Dispatchers and Controllers as "exempt" under FLSA on the ground that they are administrative employees.  DOL,

3

however, asserts that this classification is erroneous and seeks backpay for certain

employees who worked overtime hours as Dispatchers or Controllers in 2017 and

2018,[1] in addition to an injunction prohibiting Unitil Service from future FLSA

violations.

Whether Dispatchers or Controllers are administrative employees—and

therefore exempt from FLSA's overtime compensation provisions—turns on Unitil

Service's ability to establish three elements defined by DOL regulations: (1)

sufficient compensation; (2) the employees' primary job duties are performance of

non-manual or office work "directly related" to Unitil Service's management or

general business operations; and (3) the employees' primary job duties include the

exercise of discretion and independent judgment with respect to matters of

significance.  See 29 C.F.R. § 541.200(a); infra p.19.  Since the parties agree that the

sufficient compensation element has been met, the matter depends on the nature of

Dispatchers' and Controllers' job duties.


I.  Duties of Dispatchers

Unitil Service developed a general "position description" for Dispatchers in

August 2013, which describes their job duties as follows:

> Provide[ ] 24/7 monitoring and control of the electric transmission and
> distribution systems for all Unitil Electric Distribution Operating
> Companies (DOC's); provide outage management response and

---

[1] The Dispatchers are identified as Michael Bechard, Edward Diaz, Peter Leger, Scott Nichol, and Michael Pouliot, and the Senior Gas Controllers are identified as Rene Bordeleau, Jason Brooks, Samantha Keach, Scott Lacouture, and Ryan Tardif.

> reporting for all electric DOC's; and perform tasks associated with compliance with regulatory requirements including but not limited to NERC (National Energy Regulatory Commission), MDPU (Massachusetts Department of Public Utilities), NHPUC (New Hampshire Public Utilities Commission) that would include reporting, emergency response, notifications and questions regarding the electric systems. Monitor electric [software alarm] systems and take necessary actions to respond to current system conditions.

Doc. no. 20-9 at 2.  The position description states that about 60 percent of a dispatcher's time is dedicated to "monitoring and control of electric systems and emergency response"; 15 percent is dedicated to "communications and notifications," which includes "communicat[ing] with company personnel, municipal and regulatory representatives, customers, and contractors on a regular basis."; and the remaining 25 percent of the position is dedicated to "regulatory reporting compliance" and "documentation." Id.[2]

James Goudreault, manager of electric dispatch and substations at Unitil Service and a former Dispatcher, testified that the purpose of the Dispatcher position is to "provide centralized support services" to Unitil Service's customers, which are the "electric operating companies" that own and maintain physical infrastructure used to transmit electricity.  Goudreault Depo. at 22.[3]  Dispatchers

---

[2] Unitil Service updated the position description in June 2018.  The updated position description makes minor changes to the description.  Those changes are not material for purposes of DOL or Unitil Service's summary judgment motions.

[3] The parties filed several exhibits containing excerpts of Goudreault's deposition.  E.g., doc. nos. 20-7, 21-10, and 24-3.  For ease of reference, citations to Goudreault's deposition use the page number of the deposition transcript, which are consistent throughout the record, rather than the page numbers generated by the court's electronic filing system.

do not "actively control power flow."  Id. at 25.  Rather, one of the "primary responsibilities" of a Dispatcher is to "monitor and manage" Unitil Service's software systems that track issues that arise on the physical grid.  Id. at 34.

To aid with this task, Unitil Service provides "procedures" to Dispatchers that are compiled in a written manual.[4]  Goudreault testified, however, that Dispatchers are permitted to deviate from those procedures in "certain circumstances" if they can "determine an alternate way to meet the intent of the procedure and still accomplish the task without following the procedure to the letter."  Id. at 60.  Goudreault stated that Dispatchers deviate from the procedures "on a daily basis" in response to alarms delivered on their computers through software such as the outage management system and the supervisory control and data acquisition ("SCADA") system.  Id. at 61, 63; doc. no. 21-13 ¶ 15.

If there is an outage or other problem, Unitil Service's software (either SCADA or the outage management system) sends the Dispatcher "a visible and audible" alarm.  Goudreault Depo. at 41.  When a problem arises, Dispatchers determine its severity, ascertain which, if any, protective devices (such as breakers) have tripped, and isolate the area near the fault from the rest of the electrical grid to allow for safe maintenance.  Id. at 34.  The Dispatcher may send a field crew to the area or call local first responders, depending on the specific issue and whether a

---

[4] Unitil Service filed the pertinent procedures under seal, which the court has reviewed.

6

life safety hazard has been reported.  The Dispatcher also documents those calls

and incidents.

The SCADA software system, which the Dispatchers use alongside the outage

management system to monitor the condition of the physical electrical

infrastructure, "may generate hundreds of alarms in a single day," some of which

may be "nuisance alarm[s]" while others may require an immediate or emergency

response.  Id. at 63.  If the Dispatcher determines that the alarm requires an

immediate response, they may, for example, dispatch personnel for field

investigation and contact local emergency response personnel.  If the Dispatcher

determines that the alarm does not require an immediate response, potential

responses include closely monitoring the situation and notifying other personnel to

flag the issue for a follow-up investigation.  Some alarms may not require any

response, immediate or otherwise.  It is "up to the dispatcher to evaluate real-time

system conditions from the SCADA system to determine whether or not the

alarm . . . warrants an immediate response, or is a nuisance alarm, or could just be

a momentary change of state that has resolved itself."  Id.

Dispatchers can also use SCADA to control the physical infrastructure, as

SCADA generally allows them to flip switches and breakers on the electrical grid.

Some physical devices, however, are not accessible to Dispatchers through SCADA.

In those cases, Unitil Service sends field crews to operate the devices.  In addition,

while Dispatchers can use SCADA to "approximate" where a problem is, a crew

must go into the field to confirm the location.  Therefore, the Dispatcher passes the

information from SCADA to a field crew to "minimize" the locations that the field crew must search.  Id. at 110.  The field crew determines how to fix the problem.

In addition to their responsibilities during emergencies, Dispatchers de-energize pieces of physical equipment so field crews can safely conduct planned maintenance.  Specifically, Dispatchers operate switches to isolate physical equipment from the rest of the electrical grid so that the equipment can be serviced by field crews while ensuring that customers still receive electrical service. Dispatchers interact with field crews daily to respond to outages and maintain lines of communication during typical construction and maintenance.  Dispatchers also interact with field crews and assist in "troubleshooting" non-outage problems.  Id. at 42.  Dispatchers, however, do not go in the field to perform their normal activities.

Finally, Dispatchers are expected to monitor the electrical grid during normal operation to ensure voltage and power levels are maintained within certain limits. Dispatchers monitor and control devices that affect these levels.

A supervisor is always available to the Dispatchers working in the central control room, either physically in the room or by telephone.  Goudreault testified that Dispatchers communicate with their supervisor "regularly" during "normal business hours," which are weekdays from seven a.m. to three p.m., but "very rare[ly]" after those hours or on weekends.  Id. at 64.  The supervisor in the room can see all the same alarms that Dispatchers can see.  Goudreault noted that there is, however, only one person employed to supervise the Dispatchers and that the

room operates 24 hours, 7 days per week, such that "most of the working hours of

the Dispatchers are unsupervised." Id. at 65.

II.    Duties of Controllers

Turning to the Controllers, Unitil Service created a "position description" for

the Controller position dated April 2015.  It states as follows:

> This position has primary oversight responsible for the operation and
> control of the Company's gas transmission distribution system; and the
> managing of pipeline and peak shaving supplies. The incumbent must
> ensure that the system is operated within the constraints of Federal,
> State and Company codes and standards as well [as] tariff constraints
> for the receipt and control of the system supply. This position also
> provides training and daily guidance to subordinate Gas Controllers
> and Field Services Coordinator.

Doc. no. 20-11 at 2.  Unitil Service's position description states that 60 percent of

the position is monitoring and controlling gas pipeline systems, supporting

"processes related to market requirements for Unitil's transmission and local

distribution companies," and "[p]rovid[ing] general control, confirmation,

scheduling, balancing and live gas operations." Id.  Thirty percent of the position is

interpreting, organizing, and executing "complex assignments," assisting

supervisors with training, coordination, and review of work for subordinate Gas

Controllers,[5] and estimating personnel needs, scheduling and assigning work, and

---

[5] Despite the position description's references to subordinate Gas Controllers,
DOL and Unitil Service agree that Controllers did not supervise anyone.

9

managing projects of a complex nature.  Id.  The remaining ten percent of work is "[b]ack up to Field Services Coordinator as needed and off hours."  Id.[6]

Mark Dupuis, manager of gas systems operations for Unitil Service, testified that Unitil Corporation receives natural gas from "upstream suppliers" that feed into the gas transmission system that Unitil Corporation and its subsidiaries own and maintain.  Doc. no. 20-8 at 8.  Individual lines owned by Unitil Corporation and its subsidiaries feed service lines to residential, industrial, and commercial end users.

Unitil Corporation must lower the pressure of gas that flows into its transmission system to an amount that can be safely received by end users.  Dupuis testified that Controllers monitor the inflow of natural gas into the transmission system to ensure that the pressure of the inflowing gas complies with state and federal operating regulations.  Dupuis testified that, as part of their responsibility to monitor the inflow of natural gas, Controllers must "forecast supply and demand based on operational conditions as well as weather conditions."  Id. at 11.  If a Controller identifies an issue while monitoring the system, they must "either direct supplemental supply operations" or contact Unitil Corporation's suppliers to try to increase the inflow of gas.  Id.  Dupuis added that the Controllers must also monitor the pressure of gas flow through the entire pipeline, which is designed to operate

---

[6] An updated position description from April 2019 changes the name of the position to "Gas Controller I" and makes additional minor changes not material to the present issues.

only within a defined range of pressures.  Controllers are further responsible for monitoring and assessing alarms that appear on their software system and making decisions about whether first responders or technicians must be dispatched to remedy issues.

In terms of operating physical components of the system, Controllers can use software to increase or decrease gas flow into the transmission system.  However, they have neither the ability nor permission to shut down the system.  Similar to Dispatchers, Controllers do not tell field crews how to fix issues in the field. Instead, Controllers provide field crews with supporting information about the issue to help them fix the problem.

III.   Investigator Divya Sood's Declaration

In support of its objection to Unitil Service's motion for summary judgment, DOL submitted the declaration of Divya Sood, who conducted the investigation in this case on DOL's behalf.  In her declaration, Sood avers that, between March and October 2018, she interviewed four Dispatchers and two Controllers.  After the interviews, Sood prepared an "employee personal interview statement" based on each interview.  Sood sent each employee their respective "employee personal interview statement" and requested their signature on it.  Neither of the two Controllers whom Sood interviewed signed Sood's prepared statement and only one of the four dispatchers signed.

DOL did not attach the "employee personal interview statements" as evidence to support its summary judgment motion. Instead, the "employee personal interview statements" are incorporated into Sood's declaration as "sample excerpts." The sample excerpts are written from the employees' point of view, even though they are (with one exception)[7] drawn from documents unattested to by the employees. Unitil Service challenges the admissibility of the "sample excerpts" and of the statements made by its employees as relayed by Sood.

According to Sood, an anonymous Dispatcher identified as "EDD 1" told her that the Dispatchers' supervisor would decide "what to do" and that switching orders needed approval from other divisions before they could be executed. Doc. no. 24-1 at 2. Similarly, a Dispatcher identified as "EDD 2" told Sood that Dispatchers "don't make any decisions in this work—we're just told what to do" and that "we don't make decisions here." Id. at 3. Sood's declaration does not contain any additional context about what EDD 2 meant about not making "any decisions."

EDD 2 and another Dispatcher identified as "EDD 3" acknowledged that if changes needed to be made to a switching order or if something unusual happens while a switching order is being executed, Dispatchers have the authority to halt the switching and to notify the relevant manager or supervisor about the issue to receive further instructions. The Dispatchers who were interviewed said they did not have authority to make changes to switching orders.

---

[7] Sood's declaration does not state which "sample excerpt" was taken from the "employee personal interview statement" that was signed.

EDD 3 also told Sood that they have "a bunch of alarms come in all the time," most of which are due to "communication failures." Id. at 3.  The Dispatcher said that depending on the type of alarm, the Dispatcher might send an e-mail to "appropriate folks" (for unspecified "unusual alarms") or dispatch crews (for breaker trips and power outages).  Id.  EDD 3 stated that Dispatchers have "guidelines" on how to respond to each type of alarm.  Id.

The Dispatcher identified as "EDD 4" told Sood that Unitil had "written policies and procedures that cover whenever we might have to dispatch someone or any other situation we may encounter. . . . [T]here's a procedure for just about any situation that occurs . . . ." Id. at 3-4.  That Dispatcher also told Sood that everything was contained in a manual "that's so cumbersome that it's almost useless" and that the Dispatchers have "parsed out the more common things" and that Unitil Service sends out e-mail memos as reminders about what to do in certain circumstances or in situations that may arise.  Id. at 4.

The Senior Gas Controller identified as "SGC 1" told Sood that "[t]here's a procedure of a procedure for everything." Id. at 4.  A Controller identified as "SGC 2" told Sood that "[t]he situations where we can act immediately are fairly black and white." Id.  In all other situations, SGC 2 stated, "we do consult a supervisor or manual, and also rely on our internal knowledge of weather and other factors." Id.  SGC 2 provided the following example of how a Controller might handle a certain situation:

> [I]n the summer, if a heater goes out for one of the pipes, we might not notify a supervisor until the morning, but in the winter, we would.  Or

depending on the station and its importance, it could necessitate an immediate call out instead of a supervisor call.  Within certain sets of circumstances, we take one set of actions, with other circumstances, we take other actions.

Id.

## DISCUSSION

The court addresses Unitil Service's challenges to the admissibility of Sood's declaration first, and whether Dispatchers and Controllers fall within FLSA's administrative employee exemption second.

I.   <u>Admissibility of Investigator Sood's Declaration</u>

Unitil Service contends that the statements by its employees contained in Sood's declaration are inadmissible hearsay; that only one of the several anonymous employees quoted by Sood signed their "employee personal interview statement"; that DOL cannot use statements made by anonymous sources as evidence without disclosing their identities; and that DOL should have provided the entire "employee personal interview statements" to the court instead of "sample excerpts."  DOL objects to the exclusion of Sood's declaration on the grounds that the "sample excerpts" are not hearsay under Federal Rule of Evidence 801(d)(2)(D) and that Unitil Service never moved to compel DOL to disclose the identities of the anonymous employees.

A.    Hearsay

Impermissible hearsay cannot be considered in support of or in opposition to a summary judgment motion.  Davila v. Corporacion De Puerto Rico Para La Difusion Publica, 498 F.3d 9, 17 (1st Cir. 2007).  An out-of-court statement offered for the truth of the matter asserted is not hearsay if it is "offered against an opposing party" and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed . . . ."  Fed. R. Evid. 801(d)(2)(D). The statement must concern "a matter within the scope" of the declarant's agency or employment, but the making of the statement itself does not need to be within the declarant's agency.  See Larch v. Mansfield Mun. Elec. Dep't, 272 F.3d 63, 72-73 (1st Cir. 2001); see also Fed. R. Evid. 801(d)(2)(D) Advisory Committee Notes ("A substantial trend favors admitting statements related to a matter within the scope of the agency or employment.").  In other words, whether making statements to a DOL investigator is "within the scope" of the person's employment with Unitil Service does not matter because the question under Rule 801(d)(2)(D) is only whether the statements themselves concerned matters within the scope of employment.  See Larch, 272 F.3d at 72-73.

According to Sood, the employees made the statements to her in interviews in 2018, while Unitil Service employed them as Dispatchers and Controllers.  The content of the statements is within the scope of that employment, as the statements are about their job duties.  Accordingly, the employees' statements referenced in Sood's declaration are nonhearsay and may not be excluded at this stage on that

15

ground.  See id.; DCS Sanitation Mgmt., Inc. v. Occupational Safety and Health

Review Comm'n, 82 F.3d 812, 815 (8th Cir. 1996) (holding that OSHA investigator's

written documentation based on what defendant's employees told him during oral

interviews was admissible as nonhearsay under Rule 801(d)(2)(D)); Scalia v. Ghosn,

451 F. Supp. 3d 1215, 1221 (W.D. Okla. 2020) (allowing affidavit of DOL

investigator, which included statements made by anonymous employees of

defendant, to be considered at summary judgment over objection under Rule

801(d)(2)(D)); Ferring Pharm., Inc. v. Braintree Labs., Inc., 215 F. Supp. 3d 114, 121

(D. Mass. 2016) (finding that statements made by opposing party employees

incorporated into attorney's declaration were nonhearsay under Rule 801(d)(2)(D)).


   B.   Informer's Privilege & Identity of Employees

   Next, Unitil Service contends that because DOL redacted the names of the

employees whom Sood interviewed, Unitil Service was unable to depose or cross-

examine the employees about their interviews with Sood and therefore cannot test

the reliability of Sood's report of their statements.  Considering the circumstances,

this argument lacks merit.  During discovery, DOL provided Unitil Service with the

redacted "employee personal interview statements," and Unitil Service knew that

they referred to statements made by anonymous employees.  Unitil Service,

however, never brought a challenge to DOL's assertion of informer's privilege nor

did it move to compel deposition testimony from the anonymous employees.  For

that reason, Unitil Service has waived any challenge it may have made to DOL's

assertion of informer's privilege as to the employees' interviews with DOL for the purpose of that evidence's use at summary judgment.  See Ghosn, 451 F. Supp. 3d at 1221 (rejecting argument in FLSA suit that the court should, at summary judgment, strike declaration by DOL investigator that contained statements by anonymous employees because government's invocation of the informer's privilege had been unchallenged during discovery).

### C.    Signatures on "Employee Personal Interview Statements"

Unitil Service argues that the court should not consider the employees' statements because Sood's recollection in her declaration is based on documents that she prepared but the employees did not sign (with, as noted above, one exception).  The "employee personal interview statements," however, were not submitted into the summary judgment record, so their admissibility is not in question.  Rather, the evidence in question is Sood's declaration, which is admissible under Federal Rule of Civil Procedure 56(c)(4).[8]

Under Rule 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible

---

[8] In her affidavit, Sood states that the "sample excerpts" she provides from the "employee personal interview statements" are derived "from the statements that [she] received from" the employees she interviewed.  Doc. no. 24-1 ¶ 6.  The declaration is confusing in this regard, as it refers to two forms of similar evidence: the "employee personal interview statements," which Sood prepared and sent to the employees but were not signed (with one exception) and were not submitted into the record for purposes of summary judgment, and the "statements" that Sood claims the employees made to her during the interviews, to which Sood can aver by virtue of her presence at the interviews.

in evidence, and show that the affiant or declarant is competent to testify on the matter stated." Sood's declaration provides sufficient information to show that her assertions about what the employees said are based on personal knowledge. See doc. no. 24-1 ¶ 4 ("I interviewed four Electrical Distribution Dispatchers and two Senior Gas Controllers employed by Unitil Service."). Sood avers that the information presented is true to the best of her knowledge and belief, and she signed the declaration under penalty of perjury. And, as discussed above, the employees' statements are nonhearsay under Federal Rule of Evidence 801(d)(2)(D). Accordingly, Sood's declaration is admissible for purposes of summary judgment.

D.     Failure to Submit Complete "Statements"

Lastly, Unitil Service faults DOL for failing to submit the entire "employee personal interview statements" to the court. Unitil Service, however, does not dispute that DOL provided it the complete statements during discovery. Indeed, Unitil Service quotes additional portions of the statements in its reply brief. Unitil Service could have submitted the complete "statements" into the record if it deemed them necessary to a fair evaluation of the motion for summary judgment.

For those foregoing reasons, Sood's declaration can be considered as to the substantive portion of the cross-motions for summary judgment, that is, whether Dispatchers and Controllers are exempt from FLSA's overtime compensation and recordkeeping rules because they are administrative employees.

II.   <u>Administrative Employee Exception</u>

Under the overtime compensation rule, FLSA requires employers to pay their employees time-and-a-half when they work more than 40 hours per week.  29 U.S.C. § 207(a)(1).[9]  An employer subject to FLSA must also comply with recordkeeping rules.  <u>See</u> id. § 211(c).  FLSA, however, exempts from these rules "any employee employed in a bona fide executive, administrative, or professional capacity . . . ."  Id. § 213(a)(1).[10]  DOL regulations further define what constitutes an administrative employee, stating that the exemption includes any employee:

> (1) Compensated on a salary or fee basis . . .  at a rate of not less than $684 per week . . . exclusive of board, lodging or other facilities;
>
> (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and
>
> (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

---

[9] Specifically, an employer violates FLSA if it employs anyone "who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for [their] employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  Id.

[10] The longstanding dictate from the Supreme Court that FLSA exemptions are to be "narrowly construed" no longer applies.  Encino Motorcars, LLC v. Navarro, 138 S. Ct. 1134, 1142 (2018) ("The Ninth Circuit also invoked the principle that exemptions to the FLSA should be construed narrowly. . . .  We reject this principle as a useful guidepost for interpreting the FLSA.");  Marcus v. Am. Cont. Bridge League, Inc., 2021 WL 1132161, at *14 (D. Mass. Mar. 24, 2021).

The employer must demonstrate that the position or employee at issue meets all three prongs of § 541.200(a) to fall within the administrative employee exception.  See id.  Here, the parties agree that Dispatchers and Controllers are salaried and compensated at a rate not less than $684 per week, satisfying the first prong of § 541.200(a).  The dispute centers on whether the primary duties of Dispatchers and Controllers are work that is "directly related to the management or general business operations" of Unitil Service or its customers and whether the positions include the "exercise of discretion and independent judgment."

A.    Whether Primary Duties are Directly Related to General Business Operations

As to prong two, § 541.200(a)(2), Unitil Service contends that the primary duties of Dispatchers and Controllers are ancillary to the principal function of Unitil Service's customers and therefore are directly related to the "general business operations" of those customers.  In contrast, DOL argues that the primary duties of Dispatchers and Controllers are directly related to Unitil Service's customers' principal functions, which it asserts is the transmission of electricity and natural gas.[11]

---

[11] The parties do not dispute that Dispatchers and Controllers perform only office or non-manual work, so the court need only determine whether the primary duties of Dispatchers and Controllers are "directly related to the management or general business operations" of Unitil Service or its customers. See 29 C.F.R § 541.200(a)(2).

"Primary duty" means "the principal, main, major or most important duty that the employee performs." Id. § 541.700(a).  The analysis of what duty is primary "must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." Id.  Courts should consider factors such as the relative importance of different types of duties, the amount of time spent performing the duties, and the amount of direct supervision of the employee.  Id.[12]

Primary duties that are "directly related to the management or general business operations" of the employer or its customers must be "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." Id. § 541.201(a).  Generally, work that is "ancillary" to the principal function of the employer or its customers will be considered "directly related" to the employer's "general business operations." See Hines v. State Room, Inc., 665 F.3d 235, 242 (1st Cir. 2011); Lutz v. Huntington Bancshares, Inc., 815 F.3d 988, 993 (6th Cir. 2016); Grage v. N. States Power Co.-Minnesota, 813 F.3d 1051, 1056 (8th Cir. 2015).  Work that is typically ancillary to principal businesses or functions includes, among other examples, quality control,

---

[12] The regulation also states that courts should consider "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." Id.  In this case, however, neither party submitted evidence that goes toward this factor.

safety and health, government relations, legal and regulatory compliance, and "similar activities."  See 29 C.F.R. § 541.201(b).

### 1.    Electric Distribution Dispatchers

The primary duty of Dispatchers is to monitor and, when circumstances dictate, control the physical electrical infrastructure that Unitil Service's customers, i.e., its sister subsidiaries, operate and maintain.  The parties do not dispute that Dispatchers spend most of their time performing this task or that it is their main job function.  The Dispatchers' other functions, such as executing switching orders, contacting field crews, and communicating with municipal first responders, are generally consequential to the Dispatchers' primary duty of monitoring the infrastructure for unusual or emergent situations.

This primary duty is "directly related" to the "general business operations" of Unitil Service's customers,[13] as it is comparable to the functional work areas listed under § 541.201(b), which lists categories of duties that should be considered administrative.  For example, the Dispatchers' responsibilities to monitor the electrical grid and ensure that it is performing in compliance with Unitil's and the

---

[13] "An employee may qualify for the administrative exemption if the employee's primary duty is the performance of work directly related to the management or general business operations of the employer's customers."  29 C.F.R. § 541.201(c).  Because the duties that Dispatchers and Controllers perform are coextensive with the services that Unitil Service provides, the parties focus on whether the duties are directly related to the management or general operations of Unitil Service's customers, which are its sister corporations within Unitil Corporation.

government's standards are analogous to "quality control" and "regulatory compliance" functions.  See 29 C.F.R. § 541.201(b).  Dispatchers also perform "health and safety" tasks when they interpret alarms via SCADA to determine whether they require corrective action and when, consequent to that function, they operate switches to isolate devices or service areas to ensure that field crews can safely work on the physical infrastructure.

Other courts that have addressed whether employees with similar primary duties are exempt have likewise found these duties to be directly related to their employers' general business operations.  In Galdo v. PPL Electric Utilities Corporation, for example, a utility company with operations similar to Unitil Corporation employed "system operators" whose primary duty included "evaluating and controlling [the corporation's] electrical grid, documenting maintenance and work activities, and executing emergency procedures when needed."  2016 WL 454416, at *5 (E.D. Pa. Feb. 5, 2016).  The court found that "[t]hese duties contribute to the running of [the utility company's] business, as they are ancillary to [the utility's] principal production activity of generating electricity."  Id.  It added that those duties "moreover, fall within the functional areas identified by the Secretary of Labor's regulations as work directly related to management or general business operations."  Id.  DOL contends that Galdo is distinguishable because PPL, the utility company involved, generated electricity, unlike Unitil Service.  That distinction, however, does not undercut Galdo's persuasive value because PPL's productive business operations included the transmission of electricity in addition

to the generation of electricity. See 2016 WL 454416, at *2 (noting that the system operators worked in the defendant's "Transmission Department"); Galdo v. PPL Elec. Utils. Corp., 2016 WL 4493197, at *1 (E.D. Pa. Aug. 26, 2016) (finding, after bench trial, that system operators were exempt from FLSA as administrative employees and stating that "PPL is an electrical distribution and transmission company").

Similarly, in Zelenika v. Commonwealth Edison Co., a utility company employed "Senior Distribution System Dispatchers" who worked in a centralized control room and had primary duties that included "monitor[ing] [the utility's] electrical distribution system and adjust[ing] voltages on the system using computer displays, alarm systems, maps, and controls," "receiv[ing] notifications of power outages or other emergency situations directly from customers," "documenting changes in the distribution system such as system outages," and "communicating with field crews to help resolve problems and complete repairs to the system." 2012 WL 3005375, at *2 (N.D. Ill. July 23, 2012). The Northern District of Illinois found that those primary duties were directly related to the utility company's general business operations even where its productive operations included transmission of electricity. Id. Considering that the duties of the "system operators" in Galdo and the "Senior Distribution System Dispatchers" in Zelenika are almost identical to the duties of Dispatchers, the reasoning and result in those cases are persuasive and applicable here.

24

DOL argues that, because Dispatchers can exercise control over the electrical grid using the SCADA system, they are responsible for the transmission of electricity and therefore perform a primary duty that is directly related to, rather than ancillary to, the principal business purposes of Unitil Service's customers.  But DOL overlooks that, as to their primary duties, Dispatchers only exercise control over the system in limited circumstances when health, safety, or regulatory prescriptions require it.  In all other circumstances, the infrastructure operates without action from the Dispatchers.  For example, if a power outage occurs, Dispatchers can flip switches to prevent injury to field crews while the field crews try to repair electrical lines to restore power to end users.  Dispatchers also use the SCADA system to attempt to narrow the location of the problem to help field crews identify the physical location where a repair may be necessary.  And if a Dispatcher detects a situation where voltage or power is outside operating restrictions or expectations, which may result in injuries to end users, the Dispatcher can manipulate the system to try to bring it back in compliance.  In each example where Dispatchers exercise control over the electrical grid, Dispatchers act in support of Unitil Service's customers and its field crews.  That a Dispatcher's primary duty may be necessary to the safe and successful operation of Unitil Corporation and its subsidiaries is immaterial because it is nonetheless "ancillary" to the firm's principal productive functions.  See Hines, 665 F.3d at 242 ("The sales aspect of the defendants' businesses, although necessary to their success, is clearly ancillary to the principal function of actually providing the banquet services themselves.").

In sum, the primary duty of Dispatchers for Unitil Service is remote monitoring of the physical infrastructure owned and operated by Unitil Service's customers and intervening in limited circumstances to control the infrastructure to ensure the safety of other employees who maintain the infrastructure.  Dispatchers do not build or maintain that infrastructure.  Rather, they support the elements of Unitil Service and Unitil Service's customers that do.  For the foregoing reasons, the primary duty of Dispatchers is "directly related" to the general business operations of Unitil Service's customers.  Accordingly, as to the Dispatcher position, Unitil Service has shown that is entitled to summary judgment in its favor as to prong two of the administrative employee exemption, § 541.200(a)(2).

### 2.   Senior Gas Controllers

Controllers also perform work that is "directly related" to the "general business operations" of Unitil Service's customers.  The primary duty of Controllers is to monitor the flow of natural gas through Unitil's transmission systems to ensure that the pipeline is operating correctly and that the gas flow complies with corporate, state, and federal standards.

As with Dispatchers, the primary duty performed by Controllers is comparable to the functional work areas listed under § 541.201(b).  For example, monitoring the pressure of flowing gas to ensure that it complies with regulatory requirements is a "regulatory compliance" task.  See 29 C.F.R. § 541.201(b). Monitoring the transmission system and tracking alarms to determine whether

problems have arisen on the system are health, safety, and quality control tasks.
See id.

In addition, the Controller position is analogous to the position at issue in
Zannikos v. Oil Inspections (U.S.A.), where employees' primary duties were directly
related to assisting with the running or servicing of a business's customers when
they included "observing oil transfers to verify that performance was accurate,
legal, and safe," "monitor[ing] the loading and unloading of cargo and report[ing]
any errors or losses," and  "monitor[ing] and report[ing] on transfers' compliance
with Oil Inspections' safety policies and nationally recognized safety standards."
605 Fed. Appx. 349, 353-54 (5th Cir. Mar. 27, 2015).

Therefore, as to the Controller position, Unitil Service is entitled to summary
judgment in its favor as to prong two of the administrative employee exemption,
§ 541.200(a)(2).


B.   Whether Primary Duties Include Exercise of Discretion and
     Independent Judgment

As to prong three, § 541.200(a)(3), Unitil Service contends that Dispatchers
must use their discretion and independent judgment when monitoring the electrical
infrastructure to determine whether any problematic conditions exist, including
power outages and health and safety situations.  Unitil Service asserts that, while
there are procedures that Dispatchers must follow once they determine what the
issue is, a Dispatcher's responsibility is to determine which procedure of many is
appropriate to follow.  In addition, Unitil Service argues that Dispatchers are

permitted to deviate from procedures to accomplish the procedure's intent if necessary.  As to Controllers, Unitil Service contends that they have authority to formulate, affect, interpret, and implement policies and operating practices on a daily basis.

DOL, on the other hand, argues that a genuine dispute of material fact exists as to whether Dispatchers and Controllers exercise discretion and independent judgment in their jobs.  In support, DOL references Sood's declaration, in which she recounts statements made to her in interviews with Dispatchers and Controllers. DOL argues that these statements are sufficient to show that a genuine dispute of material fact exists as to whether Dispatchers and Controllers exercise discretion and independent judgment.  DOL also contends that Dispatchers and Controllers are constrained in their discretion and independent judgment by Unitil Corporation's written procedures.[14]

"[T]he exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a).  Exercise of discretion and independent judgment means that an employee has the authority to make independent choices free from "immediate

---

[14] Prong three requires the employer to demonstrate that discretion and independent judgment are used "with respect to matters of significance." 29 C.F.R. § 541.200(a).  In this case, however, DOL does not contend that remote monitoring of physical infrastructure and responding to alarms, which are the primary duties of Dispatchers and Senior Gas Controllers, are not matters of significance to Unitil Service.

direction or supervision." Id. § 541.202(c).  At the same time, however, "employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level" and "decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action."  Id.  Unlimited authority or complete absence of review is not a prerequisite to "exercise of discretion and independent judgment."  Id.

          1.     <u>Electric Distribution Dispatchers</u>

The undisputed facts demonstrate that Dispatchers' primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.  Specifically, Dispatchers must exercise discretion and independent judgment in interpreting the data provided to them through SCADA and the outage management system, which they use to monitor Unitil Corporation's electrical infrastructure.  Both Goudreault and the anonymous Dispatchers interviewed by Sood stated that they respond to a high number of alarms.  Goudreault explained further, testifying that Dispatchers are expected to interpret these alarms and to determine whether they can be safely ignored or require a reaction.  See 29 C.F.R. § 541.202(b) (stating that whether the employee investigates and resolves matters of significance on behalf of management is a factor in considering whether work requires the exercise of discretion and independent judgment).

The reasoning and result in the <u>Galdo</u> case, already discussed above, is also applicable to whether Dispatchers' primary duty includes exercise of discretion and independent judgment.  In <u>Galdo</u>, the "system operators" spent—much the same as the Dispatchers at issue in this case—"the majority of their work day interpreting and implementing management policies or operating practices by monitoring Defendant's electrical grid, coordinating planned work outages and repairs, and addressing emergent situations."  <u>Galdo</u>, 2016 WL 4493197, at *8.  Although system operators were "constrained in their actions by PPL's extensive sets" of instructions and procedures, the evidence showed that "these materials are hardly akin paint-by-number kits foreclosing discretion and independent judgment."  <u>Id.</u>  The court also observed that the system operators "must exercise judgment" in determining which instructions or procedures were applicable after considering the circumstances and that, while the instructions "might give a step-by-step procedure on how to perform a specific action, [they] do[] not specify when that action is necessary or why."  <u>Id.</u>  Considering these facts together, the court found that system operators exercised discretion and independent judgment with respect to matters of significance.  <u>Id.</u>

DOL contends that Unitil Service's manual forecloses Dispatchers' discretion and independent judgment, but the procedures in the manual are like those described in <u>Galdo</u>.  To be sure, Unitil Service's manual includes procedures that prescribe what actions Dispatchers must take in certain situations, but the manual does not explain in detail the contexts or circumstances in which certain procedures

are applicable, nor does it explain how Dispatchers should determine what procedure to apply based on what they see in the SCADA or outage management system.  Instead, those matters are left to Dispatchers' discretion and independent judgment.

Sood's affidavit is also insufficient to create a genuine dispute of material fact as to exercise of discretion and independent judgment.  EDD 2 told Sood that "[w]e don't make any decisions in this work—we're just told what to do," but that statement is not sufficient to create a genuine dispute about whether Dispatchers exercise discretion and independent judgment in their primary duty because it is conclusory and lacks sufficient supporting factual matter.  See Serra v. Quantum Servicing Corp., 747 F.3d 37, 40 (1st Cir. 2014) (stating that "allegations of a merely speculative or conclusory nature are rightly disregarded").  Neither EDD 2's other statements to Sood nor DOL's other evidence lend factual support to the conclusion that Dispatchers do not "make any decisions," which can only be reasonably construed as hyperbole when considered with context.  See Conward v. Cambridge Sch. Comm., 171 F.3d 12, 18 (1st Cir. 1999) (stating that the court should "refuse[] to indulge rank speculation or unsupportable hyperbole" at summary judgment).  For example, EDD 2 gives an example of a decision that Dispatchers can make when observing that Dispatchers can tell field crews to stop during switching orders.[15]  And DOL itself asserts in its statement of undisputed facts that

---

[15] EDD 3 likewise observes that Dispatchers have "authority" to halt switching if the Dispatcher determines that "something unusual" happens.  Doc. no. 24-1 at 3.

Dispatchers can decide to deviate from Unitil Service's procedures "on occasion." Doc. no. 24 at 4, ¶ 12.

DOL also points out that Dispatchers must usually clear their decisions with supervisors. Goudreault, however, testified that only one person is employed to supervise the Dispatchers, and it is undisputed that Dispatchers spend most of their time working without supervision. In any event, the regulations do not mandate that an employee's use of independent judgment and exercise of discretion come without any supervisory review. See 29 C.F.R. § 541.202(c) (explaining that use of independent judgment and exercise of discretion does not require employee to have final decision-making authority or be entirely unsupervised); Hines, 665 F.3d at 245-46 ("The regulations likewise provide that an employee's discretionary actions need not 'have a finality that goes with unlimited authority and a complete absence of review' . . . . The fact that, after engaging a potential client and arriving at a proposed agreement for a banquet, the sales managers submitted the proposal to management for approval does not, therefore, detract from the judgment that was exercised in arriving at the proposal in the first instance."). Here, even if their decisions are recommendations or proposals when a supervisor is present, Dispatchers must still exercise discretion and independent judgment when making those recommendations. See Hines, 665 F.3d at 245-46.

Lastly, DOL's argument that Dispatchers do not use independent judgment or exercise discretion in their primary duty because they are told how to execute switching orders and because certain communications with field crews are scripted

is unpersuasive.  Although Dispatchers must follow specific scripts outlined in the procedures when communicating with field crews in some circumstances, just because one aspect of the Dispatchers' primary duty offers limited opportunities to exercise independent judgment or discretion does not mean it does not "include" aspects that do.  Likewise, executing switching orders is only one aspect of Dispatchers' primary duty.  Because the regulations only require independent judgment and exercise of discretion to be "included" in the employee's primary duty, whether Dispatchers spend some of their time on tasks that do not require independent judgment or exercise of discretion is immaterial.  See 29 C.F.R. § 541.200(a)(3).

2.    Senior Gas Controllers

As with Dispatchers, DOL contends that Controllers do not use independent judgment and discretion because many of their decisions are subject to the review of supervisors or dictated by procedures.  As with Dispatchers, however, that reality does not mean that Controllers lack the ability to use discretion and independent judgment as part of their primary duty.  At the monitoring, diagnosis, and triaging stage, which the parties do not dispute constitutes the bulk of the Controllers' job responsibilities, Controllers must exercise discretion and independent judgment.  For example, Controllers must interpret the meaning of alarms on their software systems and use their judgment to determine whether the alarm presents a problem that requires immediate attention.  If the situation requires immediate

33

attention, the Controller must use their judgment to decide what type of issue occurred, such as whether the issue is mechanical or a failure of a field device.

The only other relevant evidence that might support DOL's position that Controllers do not exercise discretion and independent judgment is from Sood's declaration.  The statements in Sood's declaration, however, are not sufficient to generate a genuine issue of material fact.  For example, SGC 1 states that there is a "procedure of a procedure for everything," but, considered in context, SGC 1 was discussing how Controllers handle situations after using their independent judgment to determine that an issue requires handling.

Indeed, SGC 2's statements confirm that Controllers use independent judgment and exercise discretion.  Specifically, SGC 2 observed that there are "situations where we can act immediately" and, in formulating a decision about whether immediate action or what kind of response is necessary, Controllers "consult" with a supervisor or their manual while at the same time relying on their own experience.  As SGC 2 states, "[w]ithin certain sets of circumstances, we take one set of actions, with other circumstances, we take other actions."  Doc. no. 24-1 at 4.  Making an informed decision or recommendation about which set of actions to take depending on the present circumstances after consultation with training materials, supervisors, and personal experience is paradigmatic exercise of discretion and independent judgment.  See 29 C.F.R. § 541.202(a) ("[T]he exercise of discretion and independent judgment involves the comparison and the evaluation of

34

possible courses of conduct, and acting or making a decision after the various possibilities have been considered.").

## CONCLUSION

For the reasons discussed above, Unitil Service has shown that there are no genuine disputes of material fact and that Dispatchers and Controllers fall within FLSA's administrative employee exemption, 29 U.S.C. § 213(a)(1) and 29 C.F.R. § 541.200(a), as a matter of law.  It follows that Unitil Service is entitled to summary judgment on DOL's claims that it violated FLSA's overtime compensation and recordkeeping provisions as to those employees.  Accordingly, Unitil Service's motion for summary judgment (doc. no. 21) is granted.  DOL's motion for summary judgment (doc. no. 20) is denied.

No claims remain in this suit.  The clerk of court is directed to enter judgment in favor of Unitil Service and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

November 17, 2021

cc:    Counsel of Record