# United States Court of Appeals
## For the First Circuit

No. 22-1070

MARTIN J. WALSH, Secretary of Labor,
UNITED STATES DEPARTMENT OF LABOR,

Plaintiff, Appellant,

v.

UNITIL SERVICE CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Landya B. McCafferty, U.S. District Judge]

Before

Gelpí, Selya, and Thompson,
Circuit Judges.

Dean A. Romhilt, Senior Attorney, United States Department of
Labor, with whom Seema Nanda, Solicitor of Labor, Jennifer S.
Brand, Associate Solicitor, and Rachel Goldberg, Counsel for
Appellate Litigation, were on brief, for appellant.
William D. Pandolph, with whom Sulloway & Hollis, P.L.L.C.
was on brief, for appellee.

January 11, 2023

GELPÍ, **Circuit Judge**.  Compliance with the Fair Labor Standards Act's ("FLSA") overtime pay requirements is critical to ensuring worker protections.  Before us, Appellant, the Department of Labor ("DOL"), seeks overtime compensation under the FLSA for hours worked in excess of forty hours per week for two categories of employees -- Dispatchers and Controllers -- employed by Appellee, Unitil Service Corporation ("Unitil Service").  Unitil Service argues that these workers are exempt "administrative" employees under federal law and as such are not entitled to overtime payments.  The district court found that the employees' "primary duty" was "directly related" to the general business operations of Unitil Service's customers and concluded that the employees were "administrative," exempt from the FLSA, and thus not entitled to overtime pay.  Summary judgment was granted in favor of Unitil Service.  The DOL filed a timely appeal.  For the following reasons, we vacate the grant of summary judgment and remand to the district court for further proceedings consistent with this opinion.

## I. Background

Unitil Service is a New Hampshire corporation and wholly-owned subsidiary of Unitil Corporation ("Unitil Corporation"), a public utility holding company that owns local and regional utility companies providing gas and/or electricity to approximately 200,000 residential, commercial, and industrial

customers in New England.  Unitil Corporation and its subsidiaries do not own power plants, generate electricity, or produce any natural gas themselves.  Unitil Service provides "administrative and professional services on a centralized basis" to Unitil Service subsidiaries ("Distribution Operating Companies" or "DOCs"), "including regulatory, financial, accounting, human resources, engineering, operations, technology, energy management and management services."  More specifically, Unitil Service operates, monitors, and controls the electrical grid and gas pipelines that distribute electricity and gas to the DOCs' end-user customers.  This includes operating centralized electric and gas control rooms staffed by the Electric Distribution Dispatchers ("Dispatchers") and Gas Controllers ("Controllers") at issue here.

**a. Duties of Dispatchers**

Dispatchers are employed by Unitil Service in a centralized work area known as Central Electric Dispatch. According to Unitil Service's general position description, their duties include:

> Provid[ing] 24/7 monitoring and control of the electric transmission and distribution systems for all [DOCs]; provid[ing] outage management response and reporting for all electric [DOCs]; and perform[ing] tasks associated with compliance with regulatory requirements including but not limited to NERC (National Energy Regulatory Commission), MDPU (Massachusetts Department of Public Utilities), NHPUC (New Hampshire Public Utilities Commission) that would include

> reporting, emergency response, notifications
> and questions regarding the electric systems.
> Monitor[ing] electric [software alarm]
> systems and tak[ing] necessary actions to
> respond to current system conditions.

In total, approximately 60% of a Dispatcher's time is

spent "perform[ing] monitoring and control of electric systems and

emergency response"; 15% in "communications and notifications";

and 25% in "regulatory reporting compliance" and "documentation."

### b. Duties of Controllers

Controllers are employed by Unitil Service in a similar

capacity but for gas DOCs.  Their position description reads:

> This position has primary oversight
> responsib[ility] for the operation and control
> of the Company's gas transmission distribution
> system; and the managing of pipeline and peak
> shaving supplies.  The incumbent must ensure
> that the system is operated within the
> constraints of Federal, State and Company
> codes and standards as well tariff constraints
> for the receipt and control of the system
> supply.  This position also provides training
> and daily guidance to subordinate Gas
> Controllers and Field Services
> Coordinator[s].

As a result, approximately 60% of a Controller's time is spent

monitoring and controlling gas pipeline systems, supporting

"processes related to market requirements" for DOCs, and providing

"general control, confirmation, scheduling, balancing and live gas

operations"; 30% interpreting, organizing, and executing complex

assignments, assisting with training and coordination of work for

subordinate Controllers, estimating personnel needs, scheduling

- 4 -

and assigning work, and managing complex projects; and 10% serving as "[b]ack up to [the] Field Services Coordinator as needed."

Generally speaking, both Dispatchers and Controllers monitor their respective systems for automated alerts or other developments and respond accordingly to keep electricity or gas flowing safely.[1]  While they do not actively control the flow of electricity or gas, they do determine whether alerts warrant responses such as shutting off or re-routing the flow of gas or electricity, dispatching service crews, or communicating with local authorities and other divisions within the company.  Each role has a manual that covers standard responses to most situations, and each role has supervisors who are available to address major issues.  Both Dispatchers and Controllers can respond independently to some situations and deviate from certain procedures, although the extent of their decision-making authority and the frequency with which situations require this purported exercise of discretion are points of dispute.  Both groups reported working, on occasion, substantially over forty hours per week.

## II. Procedural History

Following a DOL investigation into the Dispatchers' and Controllers' work, the DOL filed suit in the District Court for

---

[1] We note that we group Dispatchers and Controllers here because the nature of their work is similar save for one monitoring gas and the other electricity.

the District of New Hampshire against Unitil Service alleging
violation of the FLSA's requirement that employees be paid overtime
unless they are exempt.    29 U.S.C. §§ 206-207, 213.    Each
party submitted a motion for summary judgment and the district
court -- applying the summary judgment standard -- concluded that
Dispatchers and Controllers are exempt from overtime requirements
because they are "administrative" employees under the FLSA. U.S.
Dep't of Lab. v. Unitil Serv. Corp., 573 F. Supp. 3d 566, 580
(D.N.H. 2021).    This appeal followed.

## III. Discussion

On appeal, the DOL argues that Dispatchers and
Controllers do not satisfy the FLSA's administrative exemption and
thus are entitled to overtime pay.    More specifically, the DOL
argues that the district court did not properly evaluate the job
duties of both categories of workers under the second prong of the
administrative exemption of the FLSA's regulations, discussed
infra.    Rather than relying on and analogizing to the relevant
regulation's list of functional areas that can be (but are not
necessarily) administrative, as the district court did, the DOL
posits that the district court should have instead engaged in a
"relational" analysis that considers the relationship between the
job duties of the roles in question and the business purposes of

the employer or its customers.  We agree,[2] acknowledge that our circuit's precedent on this issue is limited, commend the district court for attempting to parse out our limited jurisprudence, clarify the application of the "relational" analysis test, vacate the grant of summary judgment for Unitil Service, and remand to the district court to apply the test we now outline.

### a. Standard of Review

This case comes before us at the summary judgment stage. Thus, we review the issues de novo and draw all reasonable inferences in favor of the nonmovant -- here, the DOL.  Cash v. Cycle Craft Co., 508 F.3d 680, 682 (1st Cir. 2007).  "Summary judgment is appropriate only when the record 'show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Id. (quoting Fed. R. Civ. P. 56(c)).

### b. The FLSA

The FLSA requires that covered employers pay certain employees an overtime premium "at a rate not less than one and one-half times the regular rate at which [they are] employed." 29 U.S.C. § 207(a).  Employees "in a bona fide executive,

---

[2] The DOL also argues that the district court misapplied the third prong of the administrative exemption test.  Because an employer must satisfy all three prongs to satisfy the administrative exemption, and because we vacate on the second prong, we need not (and do not) reach these arguments.

administrative, or professional capacity[,] . . . as such terms
are defined and delimited from time to time by regulations of the
Secretary," however, are exempt from these provisions, and thus
not entitled to overtime payment. Id. § 213(a)(1) (emphasis
added). The Secretary's regulations define those working in an
"administrative" capacity to include those employees:

> (1) Compensated on a salary or fee basis
> pursuant to § 541.600 at a rate of not less
> than $684 per week . . . exclusive of board,
> lodging or other facilities;
> (2) Whose primary duty is the performance of
> office or non-manual work directly related to
> the management or general business operations
> of the employer or the employer's customers;
> and
> (3) Whose primary duty includes the exercise
> of discretion and independent judgment with
> respect to matters of significance.

29 C.F.R. § 541.200. Thus, to fall under the exemption, each of
the three prongs must be satisfied and the employer bears the
burden of establishing each prong. See Reich v. John Alden Life
Ins. Co., 126 F.3d 1, 7-8 (1st Cir. 1997). The DOL has promulgated
additional regulations defining the terms discussed in the second
and third prongs, listing relevant factors for consideration, and
identifying examples of employees who may qualify for the
exemption. 29 C.F.R. §§ 541.201-.203.

Before us, the parties do not dispute that the first
prong -- the sufficient compensation requirement -- is met.
Instead, the dispute turns on whether the remaining two prongs

were satisfied.  Because we vacate on the second prong, we do not address the third prong -- the discretion-and-independent-judgment prong.

### c. The Second Prong

Whether both classes of employees are administrative employees -- and thus exempt from overtime payment -- turns on whether their "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." Id. § 541.200 (emphases added).

The parameters of the administrative exemption are articulated in the DOL's regulations.  "Primary duty" is defined to mean "the principal, main, major or most important duty that the employee performs," and generally means that employees spend at least 50% of their time performing the duty.  Id. § 541.700. And "directly related to the management or general business operations" "refers to the type of work performed by the employee." Id. § 541.201(a).  "To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  Id. (emphasis added).  This can include "work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control;

- 9 -

purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations[;] government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities." Id. § 541.201(b) (outlining a non-exhaustive list of examples of "[w]ork directly related to management or business operations").

While our jurisprudence on the second prong is limited, we clarify here that the analysis is indeed -- as described by the DOL -- a "relational" one. Although often framed as one question, it entails two: (1) whether the employee's role relates to "running or servicing the business," and if so, (2) what the scope or "generality" of the employee's role is. See Bratt v. County of Los Angeles, 912 F.2d 1066, 1070 (9th Cir. 1990) ("The test is whether the activities are directly related to management policies or general business operations. . . . [This] mean[s] 'the running of a business, and not merely . . . the day-to-day carrying out of its affairs.'"). We explain each question in turn.

**i. Whether the Employee's Role Relates to "Running or Servicing the Business"**

The first question asks whether the employee's duty is related to the goods or services offered for market or whether it is related to running the business itself. See Bothell v. Phase Metrics, Inc., 299 F.3d 1120, 1127 (9th Cir. 2002). One useful

but non-dispositive distinction that courts have used is the
distinction between "administrative" staff and "production"
employees.   See John Alden, 126 F.3d at 9-10 (discussing
"Administrative-Production Dichotomy"); see also 29 C.F.R.
§ 541.201(a) ("To meet this requirement, an employee must perform
work directly related to assisting with the running or servicing
of the business, as distinguished, for example, from working on a
manufacturing production line or selling a product in a retail or
service establishment.").

        This administrative-production distinction was the basis
for the test that our circuit has generally applied: considering
whether an employee's duties are "ancillary" to the business's
"principal production activity" or "principal function." See John
Alden, 126 F.3d at 10; Hines v. State Room, Inc., 665 F.3d 235,
242 (1st Cir. 2011) (considering whether the employees' duty was
ancillary to the business's "principal function"); Cash, 508 F.3d
at 684-86 (not mentioning "ancillary" test but evaluating
relationship between employee duties and business purposes). John
Alden provides a clear example.   There, we concluded that "the
activities of the marketing representatives [at issue]
[we]re clearly ancillary to John Alden's principal production
activity -- the creation of insurance policies -- and therefore
could be considered administrative 'servicing' within the meaning
of [S]ection 541.205(b)."   John Alden, 126 F.3d at 10 (likening

marketing representatives' activities to "'representing the company' and 'promoting sales'" -- examples of "exempt administrative work"). It should be noted that because the test is "relational" and applies to more than just factory production or retail, the administrative-production distinction is worth employing "only to the extent it clarifies the analysis." Bothell, 299 F.3d at 1127; see Schaefer v. Ind. Mich. Power Co., 358 F.3d 394, 402-03 (6th Cir. 2004); see also Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22122, 22141 (April 23, 2004) (codified at 29 C.F.R. pt. 541). Moreover, while that question may be helpful to determining the "principal function" of a business to distinguish between, for example, administrative and operative roles, there is little principled basis in the text of the regulation for differentiating between "'primary' marketplace offering[s] and secondary or tertiary" ones. Bothell, 299 F.3d at 1127. In fact, too much focus on whether something is the business's "primary" business purpose, or a myopic framing of that purpose, can miss the forest -- whether work is "directly related to the management or general business operations of the employer or the employer's customers," 29 C.F.R. § 541.200(a)(2) -- for the trees.

### ii. The Scope or "Generality" of the Employee's Role

The second question poses a broader inquiry meant to ensure that courts do not miss the forest for the trees. While a bit more subtle in our case law, it asks, even if an employee's work is "ancillary" to the goods or services that constitute the business's marketplace offerings, whether the employee is engaged in "management or <u>general</u> business operations." <u>Id.</u> (emphasis added).

To satisfy this second, more subtle, aspect of the test, an employee's job duties must implicate or include responsibility for "general" (i.e., higher-level or more widely applicable) aspects of the business's operations. Put another way, the test is not satisfied if an employee's duties include only the execution of routine, day-to-day operations. Such tasks would not rise to the level of "generality" across or within the organization that is contemplated by the regulation. For instance, in <u>John Alden</u>, we held that the marketing representatives at issue were exempt administrative employees because they were responsible for "promoting (i.e., increasing, developing, facilitating, and/or maintaining) customer sales <u>generally</u>," 126 F.3d at 10 (quoting <u>Martin</u> v. <u>Cooper Elec. Supply Co.</u>, 940 F.2d 896, 905 (3d Cir. 1991)), rather than responsible for merely performing routine sales tasks, <u>see</u> <u>Bothell</u>, 299 F.3d at 1127 ("<u>John Alden</u> stressed that the daily <u>tasks</u> performed . . . , including managing hundreds

of agents and developing 'customer sales <u>generally</u>,' were consistent with . . . administrative activities in [the regulation]."). <u>Cash</u> v. <u>Cycle Craft Co.</u> serves as another example. 508 F.3d 680. There, the "New Purchases/Customer Relations Manager" was responsible for "improving customer service <u>generally</u>, by coordinating with various Boston Harley departments" and not simply dealing with individual customer service issues. <u>Id.</u> at 685-86 (emphasis added).

Examples from the regulations further illustrate this distinction. "Human resources managers who formulate, interpret or implement employment policies . . . generally meet the duties requirements for the administrative exemption" while "personnel clerks who 'screen' applicants to obtain data regarding their minimum qualifications and fitness for employment generally do not." 29 C.F.R. § 541.203(e). Similarly, while a higher-level compliance employee might be considered exempt, "[o]rdinary inspection work generally does not meet the duties requirements for the administrative exemption." <u>Id.</u> § 541.203(g). And while a buyer who evaluated pricing reports or an analyst who prepared them would likely be considered exempt, "[c]omparison shopping performed by an employee of a retail store who merely reports to the buyer the prices at a competitor's store does not qualify for the administrative exemption." <u>Id.</u> § 541.203(i). Just because an employee is on the operational side of the business does not mean

that his job duties fall on the administrative side of the line. To be sure, the requirement of Section 541.200's third prong -- that the employee exercise discretion and independent judgment -- does some work in distinguishing these employees, but the generality requirement of the second prong also distinguishes them.

The history of Section 541.200(a)(2) reinforces our conclusion that an employee's duties must rise to a level of generality beyond responsibility for day-to-day tasks in order to satisfy the regulation. For instance, the prior version of Section 541.200(a)(2) referred to "management policies" rather than "management," suggesting that an exempt employee must play more than a purely operational role. See Defining and Delimiting the Exemptions, 69 Fed. Reg. at 22137-22138. The DOL clarified that the removal of "policies" was not intended to broaden the exemption but merely meant to clarify that "exempt administrative work includes not only those who participate in the formulation of management policies or in the operation of the business as a whole, but it 'also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business.'" Id. at 22138 (emphases added) (quoting 29 C.F.R. § 541.205(c)(2000)). To a certain

- 15 -

extent, this intersects with the third prong of Section 541.200, the exercise-of-discretion-and-independent-judgment prong, but it is important that the job duties themselves go beyond mere participation in day-to-day operations.

Two Sixth Circuit cases involving power plant employees lend further support. In Schaefer v. Indiana Michigan Power Co., the court considered whether a nuclear waste disposal technician's work was administrative. 358 F.3d at 398-99. The Sixth Circuit recognized that while day-to-day waste removal is "not part of production proper," it is neither "'administrative' [n]or part of 'servicing the business.'" Id. at 402. As such, in identifying the limitations of the administrative-production dichotomy and the "principal function" test, the court concluded that the technician -- whose role was a limited and highly circumscribed one -- was not an administrative employee. See id. at 402-03. Further, the court noted that while some removal procedures were unique, the scope of the technician's authority was relatively circumscribed. See id. at 403.

Moreover, in Renfro v. Indiana Michigan Power Co., the Sixth Circuit considered the case of "planners" responsible for "creating plans for maintaining equipment and systems in the nuclear [power] plant," 370 F.3d 512, 518 (6th Cir. 2004), and managing the work of other skilled employees through those plans, see id. at 515. The court acknowledged that the power company's

principal production activity was "generating electricity" and the product it offered was "electricity." See id. at 518.  Thus, because the planners "creat[ed] plans for maintaining equipment and systems in the nuclear plant," their work was "ancillary" to the power company's "principal production activity of generating electricity." Id.  While the Sixth Circuit noted that the planners were clearly not production workers, it recognized that "[w]hile not precisely 'administrative,' the planners' duties form[ed] the type of 'servicing' ('advising the management, planning,' etc.) that the FLSA deems administrative work directly related to [the power company's] general business operations." Id.

### iii. Dispatchers and Controllers

Having explained how to apply the "relational" analysis test, we now turn to the case of Dispatchers and Controllers.  As an initial matter, we note that areas like the energy sector -- where power is the product, but transmission and certain other services are inextricably linked -- and separately incorporated services corporations (common in industries like healthcare, insurance, and utilities) can create confusion on how to apply the second question of the "relational" analysis test.

Turning to the facts before us, we thus ask whether Unitil Service has conclusively shown that the Dispatchers' and Controllers' primary duties are "directly related to the management or general business operations of" either Unitil

- 17 -

Service (the employer) <u>or</u> the DOCs (the employer's customers).
<u>See</u>  29 C.F.R.  § 541.200(a)(2).    If  the  Dispatchers'  and
Controllers'  primary  duties  relate  to  Unitil  Service's  business
purpose,  in  that  they  produce  the  product  or  provide  the  service
that  the  company  is  in  business  to  provide,  the  second  prong  is
not  satisfied.    <u>Id.</u>;  <u>see</u>  <u>id.</u> § 541.201(a)  ("To  meet  this
requirement,  an  employee  must  perform  work  directly  related  to
assisting  with  the  <u>running  or  servicing</u>  of  the  business,  as
distinguished,  for  example,  from  working  on  a  manufacturing
production  line  or  selling  a  product  in  a  retail  or  service
establishment." (emphasis added)).

        The  district  court  was  correct  in  finding  that  the
primary duties of the Dispatchers and Controllers are to provide
the  very  services  that  Unitil  Service  is  in  the  business  of
providing.    Unitil  Service's  business  purpose  is  to  provide
operational and administrative services to its subsidiaries.  The
primary duties of the Dispatchers and Controllers are to provide
these various services -- to operate and monitor their respective
electrical  grids  and  gas  pipelines  for  the  DOCs  --  and  thus  are
the  very  services  that  Unitil  Service  is  in  business  to  provide.
Because the Dispatchers' and Controllers' primary duties relate to
Unitil  Service's  business  purpose,  the  second  prong  of  the
"administrative"  exemption  is  not  satisfied.    Consequently,  the
only  way  Unitil  Service  --  which  bears  the  burden  of  establishing

that an employee falls under the FLSA's "administrative" exemption -- can satisfy the second prong is to show that the Dispatchers' and Controllers' primary duties are directly related to the general business operations of the DOCs (the employer's customers).

To determine whether Unitil Service can satisfy the second prong in this regard, we turn to (1) whether the Dispatchers' and Controllers' primary duties relate to the "running or servicing" of the DOCs, and if so, (2) what the scope or "generality" of their role is. See Bratt, 912 F.3d at 1070 ("The test is whether the activities are directly related to management policies or general business operations. . . . [This] mean[s] 'the running of a business, and not merely . . . the day-to-day carrying out of its affairs.'").

As previously mentioned, the district court did not apply this "relational" analysis. Specifically, rather than compare the primary duties of the Dispatchers and Controllers to the DOCs' business purposes -- to determine whether their duties are directly related to the DOCs' general business operations or to the day-to-day operational work related to the DOCs' business -- the district court looked to a list of the functional areas in Section 541.201(b) that can be, but are not necessarily, administrative depending on the duties of the employees. Unitil Serv. Corp., 573 F. Supp. 3d at 578. The court then concluded

that the primary duties performed by the Dispatchers and
Controllers were analogous to the functional areas of "regulatory
compliance," "quality control," and "health and safety." Id.; see
also 29 C.F.R. § 541.201(b) (listing examples of the functional
areas related to "management or general business operations").

We conclude, however, that these analogies cannot bear
the weight that the district court placed upon them. As the DOL
points out, although the position description for Dispatchers
includes "tasks associated with compliance with regulatory
requirements," the record, including the "principal
accountabilities" section of the job description, does not
indicate that either Dispatchers or Controllers do anything beyond
engaging in their daily operational duties "within the limits of
the applicable Federal, State and Company codes and standards."
The same is true for engaging in work subject to certain compliance
and safety standards. Further, neither Dispatchers nor
Controllers play a role in testing or evaluating the DOCs'
distribution or pipeline systems outside of the day-to-day
monitoring of these systems. Dispatchers and Controllers do not
design or plan the systems, nor do they analyze how they work or
how they can be improved. See Renfro, 370 F.3d at 518 (finding
that because the "planners" at issue "creat[ed] plans for
maintaining equipment and systems in the nuclear plant," their
work was "ancillary" to the power company's "principal production

- 20 -

activity of generating electricity"). Accordingly, while analogizing to the functional areas may be useful in some cases, here, these analogies do not address or answer the second generality question of the "relational" analysis.

Moreover, Unitil Service's organizational makeup reveals that the company has entirely separate departments for the very functional areas outlined above. These include departments for "Business Continuity & Compliance" (employing a number of health and safety compliance specialists), "Financial Services" (employing auditors and lawyers), and "Regulatory Services" (employing regulatory analysts). That the Dispatchers' and Controllers' duties may, in a limited or superficial way implicate health, safety, and quality control tasks, does not mean that this was their "primary duty." Further, their duties lack the level of generality required by the regulation and the case law to conclude, without further inquiry, that they were engaged in "management or general business operations" as opposed to routine, day-to-day affairs, Bratt, 912 F.3d at 1070, of the DOCs. It is not clear that they direct business operations "generally" in the way anticipated by the statute and understood by our case law.

Unitil Service would have us look to two unpublished cases on which the district court relied -- Galdo v. PPL Electric Utilities Corp., No. CV 14-5831, 2016 WL 454416 (E.D. Pa. Feb. 5, 2016) and Zelenika v. Commonwealth Edison Co., No. 09 C 2946,

- 21 -

2012 WL 3005375 (N.D. Ill. July 23, 2012).  But these cases have
no role to play in our decision since they employ unpersuasive
reasoning.  Zelenika involved "dispatchers" whose job was to
"monitor [an electric utility's] power distribution system,
oversee service to the system, and respond to customer complaints
and power outages."  2012 WL 3005375, at *2.  The court determined
that the employer satisfied the second prong by analogizing to the
functional areas in Section 541.201(b) rather than engaging in a
"relational" analysis between the primary duty of the role and the
business of the utility.  See id. at *13.  However, as discussed
supra, it is not enough to look only at the list of job functions
under Section 541.201(b).  Courts must also consider whether the
employee's primary duty is contributing to the "running or
servicing of the business" and, if so, whether their
responsibilities rise to the level of generality required by the
rule.  Similarly, in determining that "system operators," who
monitored systems in the utility's transmission department, were
administrative employees, the Galdo court reasoned that they were
not production workers because they did not "generate . . . the
very product or service that the employer's business offers to the
public."  2016 WL 454416, at *4 (quoting Renfro, 360 F.3d at 517).
This reasoning, however, improperly reduced the second prong's
inquiry to the administrative-production dichotomy, rather than

employ the more flexible "relational" analysis required by the regulation.

## IV. Conclusion

Accordingly, because the district court did not apply a "relational" analysis comparing the business purpose of Unitil Service and/or its customers to the primary duty of the Dispatchers and Controllers, it was improvident to grant summary judgment to Unitil Service. Unitil Service has not demonstrated that the Dispatchers' and Controllers' primary duty consists of work "directly related to the management or general business operations" of its customers such that the employees fall under the second prong of 29 C.F.R. § 541.200. We leave it to the trier of fact to apply the "relational" analysis required by the second prong of the test. At this stage, genuine issues of material fact remain unresolved. Accordingly, we vacate the decision of the district court granting summary judgment to Unitil Service and remand for further proceedings consistent with this opinion. No costs are awarded.